UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

GINGER SEITLES,

                                    NO. CIV. S-04-2725 FCD/DAD
          Plaintiff,

     v.                             MEMORANDUM AND ORDER

UNUM PROVIDENT, UNUM LIFE
INSURANCE COMPANY OF AMERICA,

          Defendants.

----oo0oo----

     This matter is before the court on the parties' cross-motions for judgment on the administrative record, pursuant to Federal Rule of Civil Procedure 52,[1] arising out of defendants UnumProvident Corporation and Unum Life Insurance Company of America's (collectively, "defendants" or "UNUM") denial of plaintiff Ginger Seitles' ("plaintiff") claim for long-term

---

[1]     Rule 52(a)(1) provides in pertinent part: "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

disability ("LTD") benefits.[2]

For the reasons set forth below, the court finds that the proper standard of review of this matter is abuse of discretion, as opposed to de novo, and thereunder, the court finds that UNUM did not act arbitrarily or capriciously in denying plaintiff's LTD benefits claim.  As such, the court DENIES plaintiff's motion for judgment in her favor and HEREBY GRANTS judgment in favor of UNUM.

**BACKGROUND**

**A.   The Policy**

The California Independent System Operator ("CAL ISO"), plaintiff's former employer, purchased the UNUM Group Long Term Disability Policy Number 519640 (the "Plan") to provide long-term disability coverage for its active, eligible employees.  Relevant to this action, the Plan provides, in pertinent part, as follows:

> **HOW DOES UNUM DEFINE DISABILITY?**
>
> You are disabled when UNUM determines that:
> – you are **limited** from performing the **material and substantial duties** of your regular occupation due to **sickness** or **injury**; and
> – you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.  (Administrative Record ["AR"], filed July 29, 2009 [Docket #30], UACL00021.)

---

[2]   Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).  Neither party filed a reply on the motions.

**CERTIFICATE SECTION**
. . .
The policy is delivered in and is governed by
the laws of the governing jurisdiction and to the
extent applicable by the Employee Retirement Income
Security Act of 1974 (ERISA) and any amendments. When
making a benefit determination under the policy,
UNUM has discretionary authority to determine your
eligibility for benefits and to interpret the terms and
provisions of the policy.  (AR: UACL00015.)

**WHEN DOES YOUR COVERAGE END?**

Your coverage under the policy or plan ends on the
earliest of:
. . .
-the date you are no longer in an eligible group . . .
-the last day you are in active employment except as
provided under the covered layoff or leave of absence
provision.  (AR: UACL00018.)

**ELIGIBLE GROUP(S):**

All employees in active employment. (AR: UACL00009.)

**MINIMUM HOURS REQUIREMENT:**

Employees must be working at least 30 hours per week.
(AR: UACL00009.)

**ACTIVE EMPLOYMENT** means that you are working for your
Employer for earnings that are paid regularly and that
you are performing the material and substantial duties
of your regular occupation.  You must be working at
least the minimum number of hours as described under
Eligible Group(s) in each plan. (AR: UACL00043.)

(Emphasis in original.)

B.   <u>**Plaintiff's Employment History**</u>

Plaintiff worked for CAL ISO as a Senior Market Integration

Engineer.  CAL ISO is a not-for-profit public-benefit corporation

charged with operating the majority of California's high-voltage

wholesale power grid.  Plaintiff was hired by CAL ISO on July 7,

1997, and her last date of employment was November 16, 2001.[3]
Although plaintiff now asserts that she left her employment
because of a disability (AR: UACL00348-00349), records from
plaintiff's personnel file indicate that she was terminated
because of job performance issues.  Her personnel file includes
an October 11, 2001 memorandum entitled "Performance Improvement
Plan for Ginger Seitles."  (AR: UACL00846-00849).  Said
memorandum indicates that plaintiff's managers, supervisors and
co-workers had complained about certain inappropriate behavior by
plaintiff, including that she "barged" into issues in which she
had no involvement, "jumped to conclusions" unnecessarily and
made "racially insensitive slurs."  (Id.)  CAL ISO scheduled a
further review of plaintiff's performance for November 15, 2001.
However, on November 11, 2001, plaintiff entered into a
settlement agreement with CAL ISO wherein she agreed to the
termination of her employment in exchange for a payment of
$27,742.68, representing four months pay; plaintiff also released
CAL ISO from any claims arising from the termination of her
employment.  (AR: UACL00881-883.)  Notably, there are no records
in plaintiff's personnel file which indicate that, during the
entirety of her employment with CAL ISO, she had any issues
relating to her physical ability to perform her job due to
multiple sclerosis ("MS") (which plaintiff now maintains rendered
her disabled from performing her job for the company).  (AR:
UACL00846-849.)

---

[3]     Neither party has provided a citation to the
administrative record for these facts; however, the parties also
do not dispute plaintiff's dates of employment with CAL ISO so
the court has accepted these facts as true.

4

1    Following the termination of her employment with CAL ISO,

2    plaintiff began looking for new employment. (AR: UACL00954-00959,

3    UACL001249, UACL001253, UACL001256, UACL001257.)[4]  Ultimately,

4    she did not accept other employment.  She explained in a later

5    personal injury action that she declined certain positions due to

6    injuries she sustained in an automobile accident in July 2002.

7    (See Section E below.)

8         **C.   UNUM's Review of Plaintiff's Initial Benefits Claim**

9         On May 7, 2003, sixteen months after her employment with CAL

10   ISO had ended, plaintiff filed a Disability Claim Form with UNUM

11   in which she asserted she was unable to work as of November 16,

12   2001 due to MS that had been diagnosed in April 1998.  She

13   claimed her MS symptoms had worsened over time.  (AR: UACL00348.)

14   In support of her claim, plaintiff submitted an Attending

15   Physician's Statement from Philip B. Baldi, D.O., who concluded

16   that plaintiff had been disabled since November 16, 2001 due to

17   neck pain, MS, cervical disease and shoulder pain.  Dr. Baldi

18   listed plaintiff's restrictions as "anything that will exacerbate

19   back [and] shoulder [pain], like bending, lifting, reaching,

20   [and] computer work."  (AR: UACL00352.)

21        In reviewing plaintiff's claim, UNUM considered various

22   medical records predating plaintiff's claimed date of disability

23   of November 16, 2001 as well as records post-November 16, 2001.

24   The pre-November 16 records included the following: (1) a June

25   ────────────────────

26        [4]   Said citations reference plaintiff's deposition
     testimony, discussed below, and various letters UNUM received
     from prospective employers, including community colleges and
27   other companies, whom plaintiff interviewed with following her
     termination from CAL ISO (said interviews took place in April
28   2002 and June 2002).

19, 2001 report from Dr. Baldi indicating that plaintiff

complained of a rash, gastroenteritis and nausea (AR: UACL00442);

and (2) a November 13, 2001 report from Dr. James C. Stoody, a

neurologist, indicating that plaintiff complained of a "stabbing

discomfort in her feet and numbness in her extremities" but

"denied any motor impairment;" Dr. Stoody performed an

examination of plaintiff and concluded that there were "no

significant abnormalities on motor, sensory, reflex testing,

cranial nerve exam or gait and station assessment;" Dr. Stoody

described that plaintiff's symptoms were "entirely subjective at

this point in time" but that her symptoms could potentially be

"cervical in level," and he recommended she have a cervical MRI

scan.  (AR: UACL00545.)  Plaintiff did not report to either Drs.

Baldi or Stoody that she was unable to work, physically or

otherwise.  (Id.)

        Post-plaintiff's alleged date of disability of November 16,

2001, UNUN considered a November 28, 2001 office note of Dr.

Baldi which described that plaintiff was very stressed due to

losing her job, and that she felt "anxious about her unemployment

and a little bit depressed." (AR: UACL00443.)  Again, however,

plaintiff did not complain that she was unable to work,

physically or otherwise.

        Thereafter, on December 17, 2001, plaintiff had an MRI of

her cervical spine, as ordered by Dr. Stoody, that showed a

"moderate sized right paracentral disc protrusion impinging on

the right side of the spinal column." (AR: UACL00543.)  On

December 27, 2001, Dr. Stoody examined plaintiff and concluded

that the "cervical MRI scan . . . shows a C5-6 disc herniation

that is fairly substantial and eccentric to the right indenting
the spinal cord, but producing no signal change there." He
requested an EMG study regarding plaintiff's complaints of right
arm numbness and recommended that plaintiff see him in four
months. (AR: UACL00548.)

On February 26, 2002, plaintiff had a nerve conduction study
of her right upper extremity, which was normal. (AR: UACL00550.)
Also, on February 26, after seeing plaintiff, Dr. Stoody noted as
follows:

> [Plaintiff] reports a sizeable improvement in radicular
> symptoms. She actually has very little in the way of
> pain. The cervical disc herniation producing radiculopathy
> seems to have resolved. She has positive CSF serology
> consistent with MS. Visual evoked potentials were normal.
> Previous MRI scanning showed normal appearing white
> matter. *I cannot state that she unequivocally has multiple
> sclerosis, however, I think it is probable and it is
> reasonable to continue the Copaxane.* We will see her again
> in three to four months for follow up. The size of the
> disc herniation was substantial, but at this juncture with
> her asymptomic state, I cannot recommend surgical
> intervention. It is not possible to state whether the disc
> herniation has [contributed] to any degree to her symptoms.
> (AR: UACL00549.) (Emphasis added.)

In addition, plaintiff saw Dr. Baldi on February 26, 2002; he
diagnosed her with fungal nails, and plaintiff requested a
referral to a plastic surgeon for breast reduction surgery. (AR:
UACL00444.)

Plaintiff was involved in an automobile accident on July 27,
2002. Thereafter, on July 29, 2002, she saw Dr. Baldi,
complaining of headache, upper back pain, upper thoracic pain,
low back pain and left hand pain. Dr. Baldi diagnosed plaintiff
with (1) muscular ligamentous strain of the cervical and thoracic
muscles; (2) left shoulder pain with normal exam; and (3) left
hand pain. (AR: UACL00447.)

Plaintiff did not follow up with Dr. Stoody in three to four months as he had recommended during the February 26, 2002 office visit.  Instead, plaintiff returned to Dr. Stoody on July 30, 2002, over five months later, complaining of injuries that she sustained in the motor vehicle accident on July 27, 2002.  Dr. Stoody noted that neurologically plaintiff appeared to be stable. He declined to see her regarding personal injury issues.  Dr. Stoody concluded that plaintiff was "ambulatory and appear[ed] to be quite stable from a physical standpoint."  (AR: UACL00551.)

On August 13, 2002, plaintiff was seen by Dr. Baldi.  She complained of neck and left shoulder pain.  Dr. Baldi again diagnosed plaintiff with muscular ligamentous strain of the cervical and upper thoracic spine and strain of the left shoulder.  (AR: UACL00448.)

**D.**   **UNUM's Initial Decision on Plaintiff's Benefits Claim**

After a review of the above medical records, on August 5, 2003, UNUM denied plaintiff's benefits claim, finding that there was no clear diagnosis of MS and no findings to support a disability based on cervical back pain.  (AR: UACL00568-573.) UNUM advised plaintiff of her right to administratively appeal the decision.  However, plaintiff never appealed the decision and instead, filed the instant suit on November 2, 2004.  Plaintiff originally filed the case in state court, but defendants removed the action to this court on December 28, 2004.

**E.**   **UNUM Reassesses Plaintiff's Benefits Claim**

During the course of this litigation, UNUM entered settlement agreements with the United States Department of Labor

and state insurance regulators.  (Makabenta Decl., filed July 31, 2009, ¶ 2.)  As part of those settlements, UNUM agreed to reconsider claims that it had previously denied using new guidelines and procedures designed to ensure a fair and balanced decision.  (Id.)

In February of 2005, UNUM offered plaintiff the right to participate in the reassessment process.  On March 1, 2005, plaintiff agreed to have UNUM reassess her claim, pursuant to the settlement agreements, and she agreed to a stay of this action pending UNUM's review.  (Id. at ¶ 4.)

In reassessing plaintiff's benefits claim, UNUM considered, in addition to the medical records discussed above, the following:

### (1)  Plaintiff's Social Security Administration ("SSA") File

In January 2003, plaintiff applied for social security disability benefits, asserting she was disabled since November 16, 2001.  After having plaintiff examined by a mental health practitioner on February 25, 2003, the SSA found plaintiff disabled primarily due to anxiety related disorders.  Pertinent notes from that examination provided as follows:

> She is very cooperative.  Described her mood as depressed.  Mood was flat to very depressed. She was almost expressionless and moved very slowly and absent mindedly.  There was some indications of delusional and magical thinking with irrational fear of going out of her home and fear of being alone.  She is not suicidal at this time but it cannot be ruled out.  She seemed paranoid at times but reports no hallucinations.  Speech was slowed and tangential.  Difficult time staying on track. Memory was poor, difficulty with short-term memory and verbal recall.
> Axis 1: panic disorder with agoraphobia and major depressive disorder, chronically depressed.
> Axis 3: MS.

Axix 4: poor human relations, isolation, homebound.
Axis 5: 40. Serious symptoms and impairment in social
and occupational functioning.  (AR: UACL00645.)

The SSA did not find plaintiff impaired from performing full-time work from a physical standpoint.  Dr. Mark Tambellini examined plaintiff on behalf of the SSA and found that plaintiff could stand, walk or sit about six hours in an eight hour day.  (AR: UACL00718.)  Ultimately, the SSA approved plaintiff's claim for social security disability benefits as of November 16, 2001.

### (2)  A Further Review of Plaintiff's Medical Records

On February 19, 2007, UNUM requested a file review of plaintiff's medical records by a neurologist and a psychiatrist. UNUM asked of these physicians: "Do the records on file support any R&L's or impairment (psychiatric or MS related) prior to or as of 11/16/01 which was the date [plaintiff] was terminated from her employer?"  (AR: UACL00886.)

Dr. Sabrina W. Hammond, Board Certified in Internal Medicine, responded to UNUM as follows (AR: UACL00898-902): (1) while there was some support for plaintiff's diagnosis of MS, Dr. Hammond found "there [was] [in]sufficient medical evidence showing a loss of function or loss of ability to perform occupational duties due to [MS].  The medical records provided prior to and at the date of disability do not support any impairment from the diagnosis of multiple sclerosis[;]" (2) Dr. Hammond found that plaintiff's "symptoms were self-reported, mild in nature and physical and neurological testing were essentially normal.  Physical exam found no corresponding abnormalities in motor, sensory, reflex testing, cranial nerve exam or gait and station assessment.  [Plaintiff's]

complaints were basically sensory in nature.  There was minimal

pain reported with her MS symptomology.  There was a complaint of

memory loss and cognitive dysfunction however this was not

evaluated at or near the date of disability;" and (3) Dr. Hammond

concluded that plaintiff's medical records did not support any

impairment from the diagnosis of MS; there were no supported

restrictions and limitations for this diagnosis and her medical

records did not provide evidence that plaintiff was physically

unable to perform the requirements of her job for CAL ISO. (AR:

UACL00898.)

Additionally, neuropsychologist D. Malcolm Spica, Ph.D.,

reviewed plaintiff's file and concluded as follows:

> After reviewing the entire file, I do not find to a
> reasonable degree of professional certainty that
> [plaintiff's] psychiatric condition rose to the level
> of impairment around her 11/01 date of disability.  A
> subsequent evaluation two years later does document
> significant psychiatric symptomology (GAF = 40).
>
> However, it is not clear to me that the later diagnosis
> is relevant to the disability claim due to the lapse of
> time between her date of disability and the evaluation,
> and multiple intervening events including introduction
> of medications, unemployment, and a motor vehicle
> accident. Overall, although I acknowledge the [2/03]
> examination results, the file does not reflect that the
> claimant's level of behavioral health care was
> consistent with a debilitating psychiatric disorder.
> (AR: UACL00893-895.)

### (3)   Plaintiff's Deposition Testimony in Her Personal Injury Action

Plaintiff sustained personal injuries as a result of an

automobile accident on July 27, 2002, and subsequently filed a

civil action against the other driver.  UNUM obtained certain

documents from that action, including plaintiff's deposition

testimony provided on May 19, 2004.  Therein, plaintiff testified

that following the termination of her employment with CAL ISO,

she actively sought other employment, including jobs with other

ISOs as well as teaching positions. (AR: UACL 00954-959.)  She

claimed she was the "number one" candidate for a job with the New

York ISO but ultimately had to reject the position due to the

automobile accident. (<u>Id.</u>)  She also testified that she was

unable to pursue a dean of instruction position at a local

community college due to the injuries she sustained as result of

the automobile accident. (<u>Id.</u>)  Plaintiff testified that her

short term memory loss, depression and general pain, which she

complained of to her neurologist, was more from the motor vehicle

accident than her MS. (AR: UACL00941-959.)

**F.   <u>UNUM Issues Final Denial of Plaintiff's Benefits Claim</u>**

On April 9, 2007, after completing its reassessment of

plaintiff's claim, UNUM denied plaintiff's claim for LTD

benefits.  In pertinent part, UNUM concluded as follows:

> The records in [plaintiff's personal] file document she
> [was] terminated . . . and settled with California ISO
> on November 11, 2001 . . . [Plaintiff's May 19, 2004]
> deposition transcript established that [plaintiff]
> believed she was capable of working full time up to the
> date of the [motor vehicle accident].  She indicated
> that she settled with the CA ISO, resigned and applied
> for numerous jobs, interviewed for some, and claimed
> she would have taken a job at the New York ISO had she
> not been in an MVA.  [Plaintiff] also indicated she was
> going to substitute teach and in fact applied for a full
> time, tenure track position as a Business Assistant
> Professor. [Plaintiff] was also asked why she did not
> work after her employment ended with the CA ISO and
> in-between the MVA.  She answered because she was
> seeking employment and looking for a job that would fit
> her lifestyle.  After her resignation with the CA ISO
> she was looking for jobs in her area of expertise.
> [Plaintiff] further testified that she was awarded
> permanent disability by the SSA subsequent to the MVA.
> In addition, she testified that in speaking with her
> neurologist about her short term memory loss, depression,
> and the pain was not so much from the MS but more from

12

the MVA accident.

Based on our review of all the documentation in the file[,]
[t]he records support that as November 16, 2001
[plaintiff] was not disabled when she terminated her
employment with CA ISO.  The medical records reviewed by
our medical department did not support a continuous
disabling condition. [Plaintiff] may have had a later
period of disability as a result of her injuries sustained
in the MVA of July 2002; however, this period of disability
was not covered under the UNUM policy.  Because [plaintiff]
was not disabled on her last day worked, coverage ended on
November 16, 2001.  Therefore, we are upholding
the decision to deny liability on her claim.  (AR:
UACL01304-1307.)

### STANDARD

Before reaching the merits of the parties' motions, the

court must determine whether to apply de novo or abuse of

discretion review to UNUM's denial of plaintiff's LTD benefits.

The Plan at issue here is governed by the Employee Retirement

Income Security Act of 1974 ("ERISA").  In <u>Firestone Tire &</u>

<u>Rubber Co. v. Bruch</u>, the United States Supreme Court held that a

challenge to the denial of benefits under an ERISA plan is

reviewed de novo "unless the benefit plan gives the administrator

or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan."  489 U.S. 101,

115 (1989).  When a plan document gives an administrator such

discretionary authority, a court must apply the "abuse of

discretion" or "arbitrary and capricious" standard of review to

its decision to deny benefits.  <u>Id.</u> at 111; <u>see also</u> <u>Abatie v.</u>

<u>Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006).

In this case, the Plan unambiguously grants UNUM discretion

when reviewing claims.  The Plan expressly states that "[w]hen

making a benefit determination under the policy, UNUM has

discretionary authority to determine your eligibility for

13

benefits and to interpret the terms and provisions of the policy." (AR: UACL00015.)  Only where there are procedural violations "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm," does the court apply de novo review despite the discretionary grant of authority.  <u>Gatti v. Reliance Standard Life Ins. Co.</u>, 415 F.3d 978, 985 (9th Cir. 2005).  As an example of what constitutes "wholesale and flagrant violations of the procedural requirements of ERISA," the Ninth Circuit in <u>Abatie</u> cited the facts in <u>Blau v. Del Monte Corp.</u>, 748 F.2d 1348 (9th Cir. 1984), noting that in <u>Blau</u>, "the administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information."  <u>Abatie</u>, 458 F.3d at 971.

No such failure "to comply with virtually every applicable mandate of ERISA" is at issue here.  <u>Id.</u>  Nonetheless, plaintiff claims that de novo review should apply because of the structural conflict of interest that exists in this case.  UNUM does not dispute that such a conflict exists here since it both administers and funds the subject Plan.[5]  That fact, however, does not require application of de novo review.  <u>Montour v. Hartford Life & Accident Insur. Co.</u>, – F.3d –, No. 08-55803, 2009 WL 2914516, *5 (9th Cir. Sept. 14, 2009) (emphasizing that the existence of a structural conflict of interest does not alter the

---

[5]     A structural conflict of interest exists where the plan administrator is also the insurer since benefits are paid out of the administrator's own pocket, and thus, by denying benefits, the administrator retains money for itself.

standard of review itself, rather it alters the *application* of the standard).  In reviewing the administrator's decision, the conflict of interest must be weighed as a factor in determining whether there is an abuse of discretion.  Id. at *4; accord Metropolitan Life Insur. Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008).  The extent to which a conflict of interest appears to have motivated an administrator's decision "is one among potentially many relevant factors that must be considered," including the "quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary SSA disability determination, if any."  Id. at *5 (citing MetLife, 128 S. Ct. at 2352).  Ultimately, "[t]he weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case."  Id.  Therefore, this court recognizes that the inherent conflict of interest found in this case is a factor to consider when analyzing UNUM's denial of Plan benefits; however, the conflict of interest does not alter the standard of review, which, in this case, the court concludes is abuse of discretion.

## ANALYSIS

Applying the abuse of discretion standard of review, the sole issue before the court is whether UNUM abused its discretion, or in other words, acted arbitrarily and capriciously, in denying plaintiff's LTD benefits claim.  An

15

administrator's decision is an abuse of discretion only when it is without reason, unsupported by substantial evidence or erroneous as a matter of law.  Id. at *4 (describing abuse of discretion standard when a conflict of interest is not at issue); Taft v. Equitable Life Ins. Co., 9 F.3d 1469, 1472 (9th Cir. 1994).  So long as the administrator's decision has a rational basis, the court is not free to substitute its own judgment for that of the administrator in determining the eligibility for plan benefits even if the court disagrees with that decision.  Id. Under the abuse of discretion standard, the only issue is whether, on the evidence considered, the administrator's determination was "reasonable." Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412, 1417 (9th Cir. 1991); see also Clark v. Wash. Teamsters Welfare Trust, 8 F.3d 1429, 1432 (9th Cir. 1993) ("Our inquiry is not into whose interpretation of plan documents is most persuasive, but whether the plan administrator's interpretation is unreasonable.")

Moreover, the scope of review under the arbitrary and capricious standard is very limited.  The focus of an abuse of discretion inquiry is the administrator's analysis of the administrative record--it is not an inquiry into the underlying facts. Alford v. DCH Found Group Long-Term Disability Plan, 311 F.3d 955, 957 (9th Cir. 2002).  Thus, the court will not consider information outside the administrative record, as it would be improper to find a claims administrator abused its discretion based on evidence not before it at the time the decision was made.  Taft, 9 F.3d at 1472.

As set forth above, because UNUM has a structural conflict of interest in this case, the court must consider that fact in its application of the above standards.

Here, a review of the administrative record reveals that UNUM did not abuse its discretion in denying plaintiff's LTD benefits claim.  The evidence shows that UNUM made a reasonable conclusion based on the materials and records at its disposal, and there is no evidence its conflict of interest impacted the decision on plaintiff's claim.

Plaintiff's assertion that she was disabled on her last day of employment with CAL ISO, on November 16, 2001, simply is not supported by the record.  Plaintiff's medical records predating November 16 do not establish that she was precluded from performing her job duties due to MS.  And, even accepting plaintiff's claimed diagnosis of MS as true, that diagnosis, standing alone, is not sufficient to find that plaintiff was disabled as of November 16, 2001.  The Ninth Circuit has recognized repeatedly that merely because "a person has a true medical diagnosis . . . does not by itself establish disability." Jordan v. Northrop Grumman Corp. Welfare Benefit Plan (Jordan II), 370 F.3d 869, 880 (9th Cir. 2004) (upholding the denial of the plaintiff's benefits claim not because the plaintiff failed to demonstrate the existence of a medical condition [fibromyalgia] but because the plaintiff was unable to prove that her physical disability kept her from performing her job).

In this case, in June and November 2001, plaintiff did not complain to Drs. Baldi or Stoody that she was unable to work, physically or otherwise, and neither physician concluded as such.

Indeed, on November 13, 2001, just days before plaintiff's claimed date of disability, Dr. Stoody specifically noted that plaintiff "denied any motor impairment," and his examination of plaintiff revealed "no significant abnormalities" with "motor, sensory, reflex testing, cranial nerve exam or gait and station assessment."  (AR: UACL00545.)

Moreover, plaintiff's personnel file indicates that she separated her employment with CAL ISO due to performance issues; she agreed to the termination of her employment in exchange for severance monies, and she released CAL ISO from any claims relating to her termination.  Nothing in plaintiff's personnel records indicates that, during her employment, she had any medical issues which precluded her from performing her job duties for CAL ISO.  (AR: UACL00846-849.)

Following her termination, plaintiff actively sought other employment.  This fact is conclusively established by plaintiff's *own* deposition testimony, wherein she describes her efforts to obtain similar jobs at other state ISOs and teaching positions at various community colleges.  Indeed, she testified that it was the automobile accident in July 2002 that precluded her from obtaining subsequent employment; she did not testify that her MS, or any other medical condition, precluded her from working prior to the accident.

Plaintiff's medical records post-November 16, 2001 and predating the July 2002 automobile accident likewise do not support a finding that plaintiff was disabled as of November 16, 2001.  In her office visit on November 28, 2001 with Dr. Baldi, plaintiff reported only that she was stressed and a "bit

18

depressed" due to losing her job at CAL ISO; she did not report that she was unable to work due to any physical or mental condition.  Additionally, through June 2002, none of plaintiff's medical records indicate a completely, disabling condition.  Moreover, even after plaintiff's automobile accident, Dr. Stoody reported, in July 2002, that plaintiff was "ambulatory and appear[ed] to be quite stable from a physical standpoint."  (AR: UACL00551.)  While Dr. Baldi did diagnosis plaintiff with muscular ligamentous strain of the cervical and upper thoracic spine and strain of the left shoulder during the same period, his findings were made within days of plaintiff's July 27, 2002 accident--an accident which occurred over seven months after plaintiff left her employment with CAL ISO.

In addition, the court finds particularly significant to this case that plaintiff did not apply for LTD benefits from UNUM until May 7, 2003, *sixteen* months after her termination from CAL ISO.  In neither moving for or opposing judgment in the case has plaintiff explained the reason for this delay nor does the administrative record reveal a reason.  To the extent the record sheds any light on the issue, it suggests that plaintiff did not apply for benefits because she was *not* disabled from working.  As set forth above, her own sworn testimony establishes that post-her termination from CAL ISO she continued to actively seek other employment and did not ultimately secure other employment due to the automobile accident, not any disability related to her MS (diagnosed during her employment with CAL ISO).  Plaintiff testified that she had not worked between her departure from CAL ISO and the car accident because she "was seeking employment and

19

looking for a job that would fit [her] lifestyle." (AR: UACL00955-956.) Plaintiff did not testify that she was not working due to a disability. Plaintiff claimed that the automobile accident caused her to become disabled. (AR: UACL00951, UACL00956.) She sought lost earnings of $163,000 and lost future earnings of $2,649,600. (AR: UACL00997.) Plaintiff could not have obtained such earnings if she was, in fact, disabled prior to the motor vehicle accident.

Based on these facts, the court cannot find that UNUM acted unreasonably in issuing its initial denial of plaintiff's benefits claim in August 2003. Horan, 947 F.2d at 1417. UNUM's decision that plaintiff's medical records did not demonstrate that her MS precluded her from performing her job duties for CAL ISO was a rational conclusion based on the evidence before it. Moreover, the reasonableness of UNUM's decision is further bolstered by its review of plaintiff's claim as part of its reassessment process generated by the settlement agreements with the United States Department of Labor and state regulators. During that reassessment process, UNUM specifically considered the SSA's award of benefits to plaintiff dating back to November 16, 2001. Montour, 2009 WL 2914516 at *10 (holding that while ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process). Here, UNUM reasonably determined that the SSA's award of benefits did not dictate a finding that plaintiff was disabled from working at CAL ISO on

20

November 16, 2001.  The SSA based its award primarily on anxiety related disorders--disorders which plaintiff did not complain about until *after* her July 2002 accident.  Additionally, as to plaintiff's physical capabilities, the SSA found that plaintiff could stand, walk or sit about six hours in an eight hour day.  Thus, the SSA's findings do not support the conclusion that plaintiff had physical aliments that precluded her from working in November 2001.[6]

Significantly, UNUM did not reject the SSA's findings based solely on its administrator's opinions.  Instead, it requested a file review by a neurologist and a psychiatrist.  Dr. Hammond found that plaintiff's medical records did not support any impairment from the diagnosis of MS, and there were no supported restrictions and limitations for this diagnosis.  He concluded that plaintiff's medical records did not provide evidence that plaintiff was physically unable to perform the requirements of her job for CAL ISO.  As to plaintiff's alleged psychiatric condition, Dr. Spica concluded that plaintiff's later diagnosis in February 2003 of psychiatric problems was irrelevant to her condition in November 2001, considering the significant lapse in time and multiple intervening events, including the introduction of medications, unemployment and a motor vehicle accident.  Based on Drs. Hammond's and Spica's opinions, and considering the entirety of the record evidence it had before it, including

---

[6]    It is also noteworthy that the SSA did not review plaintiff's personnel file or obtain records from plaintiff's personal injury action.  Said documents amply support critical findings by UNUM in denying plaintiff's claim.

plaintiff's personnel file and deposition testimony, UNUM reasonably reached a contrary conclusion to the SSA.

Finally, in reviewing UNUM's decision, the court has considered its structural conflict of interest.  However, under the facts of this case, that conflict does not weigh heavily.  "The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of parsimonious claims-granting history."  Abatie, 458 F.3d at 968.  Here, plaintiff argues that UNUM has a history of biased claims administration, but she submits no admissible evidence on this issue.  Her reliance on a Second Circuit case finding evidence of such biased administration by UNUM and a law review article in accord is not *evidence* of biased handling relating to *plaintiff's* claim.  To the contrary, the evidence in this record suggests precisely the opposite as UNUM offered to reassess plaintiff's claim and in doing so, it specifically considered the SSA's award of benefits and it conducted a further review of plaintiff's medical records by hiring independent experts to conduct a file review.  Because there is no evidence of malice or self-dealing in UNUM's denial of plaintiff's claim here, the court's skepticism of UNUM is de minimus.  Thus, while the court considers the inherent conflict of interest found in UNUM because it both administrates and funds the Plan, that conflict, coupled with no other significant factor, does not provide the court grounds to find an abuse of discretion.

**CONCLUSION**

For the foregoing reasons, the court DENIES plaintiff's motion for judgment in her favor and HEREBY GRANTS judgment in favor of UNUM.  The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: September 29, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE